IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **ANTONIO HAWKINS,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:18cv00591 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **C/O "BIG" LUNDY,** *et al.*, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Antonio Hawkins, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983, alleging that the defendants, Correctional Officer ("C/O") "Big" Lundy, Lt. Colna, and C/O Halsey, subjected him to excessive force, denied him access to the grievance process, and retaliated against him for filing grievances. The defendants have moved for summary judgment. Having reviewed the record, the court will grant in part and deny in part the defendants' motion.

### I.

### A. Hawkins's evidence

Hawkins has submitted a verified complaint as well as an affidavit in response to the defendants' motion for summary judgment. Hawkins alleges that on May 23, 2018, he was experiencing chest pains and notified the floor officer. The floor officer called the medical department and they requested that Hawkins go there. With the floor officer's permission, Hawkins left his pod to go to the medical department. While he was on his way, Defendant Lt. Colna stopped him and told him to "get [his] ass back in the pod." When Hawkins hesitated, Lt. Colna put Hawkins in handcuffs and pushed his face into the wall. In response,

Hawkins told Lt. Colna to "suck [his] dick." Hawkins states that Lt. Colna then threatened to "beat [Hawkins'] skull in," "fuck [him] up," and "stick a broomstick up [his] ass" if Hawkins "kept running [his] mouth." Hawkins told Lt. Colna that he continued to suffer chest pains and that he would "defend [him]self if [Lt. Colna] attempted to assault [him]," to which Lt. Colna allegedly used a racial slur and stated that he hoped Hawkins died.

Five minutes later, Lt. Colna allegedly directed defendant C/O Lundy to use excessive force against Hawkins while escorting Hawkins to segregation. C/O Lundy then twisted Hawkins's wrist in the handcuffs "as hard as he could," and the more Hawkins "cried out from the pain, the more that [C/O Lundy] twisted [his] hands up [his] back," until his hands "went numb." C/O Lundy also allegedly choked "the collar of [Hawkins's] shirt around [his] neck as hard as he could" until Hawkins could not breathe.

After being placed in the Segregated Housing Unit ("SHU"), Hawkins was assessed by medical staff who observed his injuries and evaluated his chest pains. Hawkins states that C/O Lundy's wrist twist caused "nerve damage in [his] right hand and wrist," leaving the "top and thumb side of [his] right hand. . . completely numb and void [*sic*] of proper blood circulation." Hawkins claims that he can "barely open and close [his] hand without . . . muscle[-]locking spasms." Hawkins avers that he was prescribed medications for nerve pain and muscle spasms.

Later the same day, Hawkins alleges defendant C/O Halsey denied him grievance forms to file a complaint about the incident involving Lt. Colna and C/O Lundy. C/O Halsey stated, "if you['re] wri[t]ing other officers up, I'm not going to get you shit." After Hawkins subsequently obtained the grievance forms from officers on the next shift and then submitted

them, C/O Halsey went to Hawkins's cell door on June 12, 2018, and said, "good luck with those complaints making it to the mailbox."

Hawkins also states that on August 27, 2018, Lt. Colna retaliated against him for filing grievances about the May 23, 2018 incident by taking a "hit" out on Hawkins by falsely telling several "high rank[ing]" gang members that Hawkins was "snitching on them."

## B. The defendants' evidence

The defendants have submitted several affidavits in support of their motion for summary judgment, including affidavits from defendants Lt. Colna and C/O Lundy, as well as from the Grievance Coordinator, another correctional officer, and a nurse.

The defendants assert that on May 23, 2018, at approximately 8:42 a.m., Lt. Colna was in the Unit Manager's office when he heard an inmate loudly yelling and shouting profanities and vulgarities. Lt. Colna immediately exited the office to see what was going on and saw Hawkins in the vestibule area adjacent to his pod. The vestibule area is off limits to inmates unless they are on a Master Pass authorizing them to leave their building. Lt. Colna claims that Hawkins walked out of his pod when the door opened to allow the commissary cart to enter the pod.

Lt. Colna states that two other officers were in the vestibule attempting to deescalate the situation and calm Hawkins down, but Hawkins continued to yell profanities and obscenities. The other officers had Hawkins place his hands against the wall. Lt. Colna asked Hawkins where he was going because he was outside his pod and in the vestibule area. Hawkins told Lt. Colna that he was having chest pains and was going to the medical department. Lt. Colna told Hawkins that he was not authorized to leave his pod. Lt. Colna

asserts that Hawkins was "argumentative and belligerent." Hawkins allegedly yelled "suck my dick" and "fuck you" repeatedly and used other profanities. Lt. Colna recalls that Hawkins threatened him by stating that he would kill VDOC staff and that Lt. Colna had messed with the "wrong one." Lt. Colna states that he stood back from Hawkins while he talked to him in an attempt to get Hawkins to calm down and return to his cell. Lt. Colna claims that he never made any racial slurs or sexual comments to Hawkins. Lt. Colna told Hawkins to return to his cell and that he would call the medical department to see if they had called for Hawkins.

Lt. Colna learned that Hawkins was not on a Master Pass authorizing him to go to the medical department (or anywhere else on the compound). Lt. Colna states that Hawkins did not have permission to exit his pod. Hawkins continued to shout obscenities and refused to return to his cell. Due to his disruptive behavior and his refusal to return to his cell, Lt. Colna and another officer placed Hawkins in hand and leg restraints so that he could be escorted to the SHU until his behavior improved. After Hawkins was restrained, C/O Lundy came to the vestibule and he and Lt. Colna escorted Hawkins to the SHU. C/O Lundy avers that he has no recollection of Hawkins or the incident. During the escort, Hawkins continued to be disruptive and curse. Lt. Colna states that neither he nor C/O Lundy used any profanities, slurs, inappropriate words, or inappropriate actions against Hawkins while escorting him.

According to Lt. Colna, Hawkins was properly restrained per policy. Lt. Colna states that he did not order C/O Lundy to use excessive force against Hawkins and that C/O Lundy did not twist Hawkins's wrist or choke him. Lt. Colna denies that anyone used excessive force against Hawkins during the incident and claims that Hawkins's allegations that Lt. Colna threatened to "beat his skull in," "fuck [him] up," and "stick a broomstick up his ass" are

"patently false." Lt. Colna also states that Hawkins's allegations that C/O Lundy jerked his wrist and tried to choke him are also "patently false." (Aff. of H. Colna ¶ 12, Jan. 5, 2021 [ECF No. 46-2].)

After Hawkins was moved to the SHU, a nurse conducted a medical assessment. (*See generally* Aff. of L. Parks, Jan. 5, 2021 [ECF No. 46-4].) Hawkins complained of wrist pain and reported numbness in his right thumb and wrist. Hawkins was able to move his fingers and wrist. Hawkins was placed on the list to see the doctor. On May 30, 2018, Dr. Stevens saw Hawkins as a follow-up on his complaints of wrist and hand numbness. Hawkins stated that his right wrist was jerked when he was being transported to the SHU on May 23, 2018. Upon physical examination, Dr. Stevens noted that his right wrist had a "healing superficial abrasion extending around the radial aspect at the wrist with tenderness over the wrist." (*Id.* ¶ 6.) He also noted that Hawkins had good thumb and grip strength. Dr. Stevens ordered an x-ray of Hawkins's right wrist. On May 30, 2018, an x-ray was taken. The diagnosis was a "right wrist strain/pain/abrasion, with no acute abnormality." (*Id.* ¶ 7.) On June 4, 2018, Hawkins had a medical exam. On June 8, 2018, Dr. Stevens reviewed and verified the results of the x-ray. The x-ray results were "within normal limits." (*Id.* ¶ 9.) On June 13, 2018, Hawkins had another medical exam. On July 18, 2018, Hawkins complained that his right hand was still numb. Dr. Stevens noted that Hawkins had good strength of thumb and grasp and that an x-ray of his right wrist was normal. Dr. Stevens did not document any specific treatment.

The defendants also submit an affidavit from the Grievance Coordinator explaining the grievance process and describing Hawkins's attempts at exhausting his retaliation claim. (*See generally* Aff. of B. Walls, Dec. 3, 2020 [ECF No. 46-1].) Based on the VDOC's established

procedures, the defendants state that Hawkins failed to exhaust his available administrative remedies as to this claim.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the

form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

Hawkins alleges that defendants Lt. Colna and C/O Lundy used excessive force against him. The defendants deny the use of excessive force and argue that any force used was in a good-faith attempt to maintain and restore discipline. The court finds genuine disputes of material facts exist on whether the defendants used excessive force and, therefore, will deny the defendants' motion for summary judgment as to these claims.

The Eighth Amendment protects inmates from cruel and unusual punishment. *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). To succeed on an excessive force claim under the Eighth Amendment, a prisoner must establish that "the officials acted with a sufficiently culpable state of mind" and that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quotation and alteration omitted); *see, e.g., Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "The core judicial inquiry . . . [is] not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quotations omitted); *see United States v. Gore*, 592 F.3d 489, 494 (4th Cir. 2010); *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987).

> This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. . . . [N]ot every malevolent

> touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim.

*Wilkins*, 559 U.S. at 37-38 (citations and quotations omitted); *see Hudson*, 503 U.S. at 9–10; *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Gore*, 592 F.3d at 494. Whether the force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on various factors, such as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *see e.g., Wilkins*, 559 U.S. at 34.

Hawkins states that while he was in the vestibule with staff permission, Lt. Colna pushed his face into the wall and threatened him both physically and sexually. He also stated that Lt. Colna directed C/O Lundy to use excessive force against him and that C/O Lundy then twisted his wrist until his hand went numb and choked him until he could not breathe. Hawkins claims that although he verbally opposed the defendants, he did not physically resist them.

The defendants respond that Hawkins was in the vestibule without permission and that when he was confronted about it, he yelled and shouted profanities. Lt. Colna denies making any threats or sexual comments to Hawkins. Lt. Colna states that Hawkins was "properly" restrained and that Lt. Colna did not push Hawkins in the wall and C/O Lundy did not twist

Hawkins's wrist or choke him. The defendants do not allege that Hawkins physically resisted them during the incident.

The parties agree that Hawkins received medical treatment after the incident, including multiple examinations and an x-ray. Hawkins also states that he was prescribed medications for nerve pain and muscle spasms.

Having reviewed the record as a whole and drawing all reasonable inferences in the light most favorable to Hawkins, the non-moving party, the court concludes that there are genuine issues of material facts precluding summary judgment. In short, only a jury can decide whom to believe about the events of May 23, 2018. Accordingly, the court will deny the defendants' motion as to these claims and the claims will proceed to trial.

## IV.

Hawkins also claims that C/O Halsey interfered with his access to prison grievance forms or the grievance process. These allegations do not give rise to an independent constitutional claim and, therefore, the court will grant the defendants' motion for summary judgment.

The Fourth Circuit has repeatedly held that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017); *see also Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("The Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). Relying on *Adams*, district courts—including this one— have held that a prison official's failure to comply with a grievance procedure is not actionable under § 1983. *E.g.*, *Brown v. Va. Dep't of Corr.*, No. 6:07cv33, 2009 WL 87459, at *13 (W.D. Va.

Jan. 9, 2009) ("[T]here is no liability under § 1983 for a prison administrator's response to a grievance or appeal."); *Oliver v. Gray*, No. 7:09cv4, 2009 WL 366150, at *2 (W.D. Va. Feb. 12, 2009), *aff'd*, 360 F. App'x 417 (4th Cir. 2010) ("Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under § 1983."). Accordingly, the court concludes that Hawkins's allegations fail to state a plausible claim for relief against C/O Halsey and, therefore, will grant the defendants' motion for summary judgment as to this claim. Because this is the only claim against C/O Halsey, the court will also terminate him as a defendant to this action.

## V.

### A.

Hawkins alleges that Lt. Colna retaliated against him for filing grievances. The defendants argue that Hawkins failed to exhaust available administrative remedies as to the retaliation claims before filing this action, as required by 42 U.S.C. § 1997e(a). Because it is clear from the undisputed record that Hawkins did not exhaust this claim, the court will grant the defendants' motion for summary judgment as to this claim.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). A prisoner

must exhaust all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

**B.**

In support of the defendants' motion for summary judgment, the Institutional Grievance Coordinator, B. Walls, provided: an affidavit; Virginia Department of Corrections' ("VDOC") Offender Grievance Procedure, Operating Procedure ("OP") 866.1; and Hawkins's grievance records. Operating Procedure 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the

substance of procedures. Institutional Grievance Coordinator Walls explains that the grievance process provides corrections staff a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner. There is no dispute that the claims in this action are grievable under OP 866.1.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to informally resolve his complaint. According to OP 866.1, this good-faith effort generally must be documented using an informal complaint. Once an inmate files an informal complaint, it is logged in VACORIS, the VDOC's computer-based offender information management system, and a receipt is issued to the inmate. Within 15 days of receipt of the informal complaint, staff should respond to the informal complaint. If an inmate is not satisfied with the response to the informal complaint, he may file a regular grievance. If a response is not given to the inmate within 15 days of the informal complaint being logged, the inmate may proceed to filing a regular grievance and must attach the unanswered informal complaint or the receipt of the informal complaint to the grievance as documentation of his attempt to resolve the issue informally. The inmate is responsible for submitting the informal complaint in a timely manner to allow time for staff to respond within the time period allowed to file a regular grievance.

A regular grievance generally must be filed within 30 days from the date of the incident. Regular grievances are date-stamped on the working day that they are received. If the grievance meets the criteria for acceptance, it is logged in VACORIS and receipt is issued to the inmate within two working days from the date the grievance is received. If the grievance does not meet the criteria for acceptance, the grievance is returned to the inmate within two working

days from the date it is received with an explanation for why the grievance was rejected at intake. Intake rejections can be appealed to the Regional Ombudsman. The Regional Ombudsman's review of the intake decision is the final level of review.

If a grievance is accepted at intake, it may proceed through up to three levels of review. Grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing a § 1983 lawsuit. Level I reviews are conducted by the Warden or Superintendent of the prison. If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services, or Superintendent for Education. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Chief of Corrections Operations or Director of the VDOC conducts a review of the regular grievance. The time limit for issuing a Level I response is 30 days, 20 days for a Level II response, and 20 days for a Level III response. Expiration of the time limit (to include any authorized continuances) without issuance of a response at any stage of the process automatically qualifies the grievance for appeal.

## C.

On July 11, 2018, Hawkins submitted an informal complaint complaining that Lt. Colna was spreading lies about him to the inmate population and that Lt. Colna is known to retaliate against inmates. On July 24, 2018, a Unit Manager responded to the informal complaint and advised Hawkins that Lt. Colna denied the allegations and there was no evidence found to support Hawkins's claims. On August 1, 2018, Hawkins submitted a regular grievance stating that due to his informal complaints against Lt. Colna and Lt. Lundy, Lt.

Colna was "spreading vicious" lies to inmates about him and claimed that Lt. Colna and Lt. Lundy are known to retaliate. Hawkins requested an investigation of the matter. On August 2, 2018, while his regular grievance was still pending, Hawkins submitted another informal complaint complaining that Lt. Colna put a "hit" on his life. Lt. Hayes responded to Hawkins's Informal Complaint that the issue would be investigated. Thereafter, on August 10, 2018, Hawkins voluntarily withdrew his regular grievance, noting that he "understand[s] that by withdrawing this grievance, there will be no further action on this issue, nor will [he] be able to file any other grievances in the future on this issue." Hawkins signed the form withdrawing grievance before a staff witness who also signed the form. Hawkins pursued no other complaints, grievances, or appeals concerning the alleged retaliation.

Hawkins did not respond to the defendants' assertion that he failed to exhaust administrative remedies as to this claim. Because Hawkins does not allege that he further pursued his retaliation claim and that he was prevented from doing so, the court finds that Hawkins failed to exhaust available administrative remedies. Accordingly, the court will grant the defendants' motion for summary judgment as to this claim.

## VI.

For the reasons stated, the court will grant defendants' motion for summary judgment in part as to Hawkins's grievance and retaliation claims and deny it in part as to Hawkins's

excessive force claims. Hawkins's excessive force claims against defendants Lt. Colna and C/O Lundy will proceed to trial as scheduled.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties

**ENTERED** this 2nd day of December, 2021.

<u>/s/ Thomas T. Cullen</u><br>
HON. THOMAS T. CULLEN<br>
UNITED STATES DISTRICT JUDGE